So the case before you today invokes the old saying that the sum is greater than the parts. Plaintiffs' sets for various factors, when considered together, contribute to an inference of scienter. I want to stress early on that this case also involves simple common sense. Defendants have attempted to explain away each of the various factors adding up to scienter, going into a death by a thousand cuts type strategy. However, when the totality of the circumstances are considered holistically as telebs and And that's if there's an inference of scienter here. The facts before you today, especially in comparison to what we've already heard, are relatively simple and straightforward. And importantly, the only disputed element of the 10B violation before the court today is scienter. The case involves the results from tests on just 37 individual Cystic Fibrosis or CF patients for a Phase II combination drug study. Defendants first announced that 17 out of 37 of those patients had a 5% or more improvement in lung function and that 11 out of 37 had a 10% or more improvement in lung function over that 56-day drug trial. And your argument is, A, that was wrong because they were talking in absolute rather than relative, and then B, and crucially, that they either knew it was wrong or recklessly found a way to scienter that way. First of all, as to falsity, it's already been admitted. The district court already found that it was false. Defendants conceded. So yes, that was our argument before us today, is that defendants were aware of some serious issues with that number. And for awareness, you're saying that they were surprised, they didn't expect these results, there was a chloride level that seemed to be inconsistent with the results, and they then sold, some of the insiders but not all, sold a lot of stock? Five of the six defendants sold egregious amounts of stock. And as to the first part of your question, there were several big red flags that would have alerted them to the suspect nature of the results. I posit that the first and most important is that these defendants themselves, who had long medical careers, one of them was the head of Abbott Laboratories prior to coming to Vertex, said that these were like nothing else they'd ever seen before. But weren't they, presumably they wouldn't have done the study if they didn't think there's some chance they'd get good results that would result in a profitable product. That's correct. So they couldn't have been totally disbelieving or thought it was impossible? I think probably totally disbelieving and possible are slightly different. I'm not saying that it was impossible, but these defendants are themselves saying this is like a once in a lifetime type result. Didn't they on that same day on March 7 also announce that they were eliminating the double blinds in the experiment, in the study, they were going to a phase three, they were making all these very significant business and regulatory changes at the same time in reliance on the study results, as I read the record? May 7th, that's correct. However, I'm not sure, and it's not in the record or part of the case, whether those business decisions ultimately happened. That's what they said they were going to do. Correct. But if they announced to the market that they're doing those things, why would they announce that they're going to do those things? I mean, it's a big deal to eliminate the double blinds and fast forward another phase. Why would they make those announcements if they thought they were wrong about the study results? I mean, the most cynical and direct answer is to believe the price of the stock, because they didn't want to believe that those results were actually incorrect because that would bring the stock price down. But then get to the fact that the two top people, as I understand it, the CEO and the founder and the director, made no suspect sales post-announcement. One made no sales. I will agree with that. And the other just made weekly, relatively small, periodic sales. Right, but we don't have any information about those Wednesday sales or the plan that they were executed under. It could be that that plan was entered into once they already had the results in hand. Doesn't your study show prior sales by that same person before? It's correct. Smaller, but prior sales. Right. But then you have the chief scientific officer. Just say the CEO, who is a scientist. Correct. Is your theory that he was nodding on it? No, but in order to find CN2, it doesn't have to be that 100% of the insiders sold stock. Excuse me. If you look at the Shaw decision from the First Circuit, you have no insiders selling stock there. You have two non-named defendants selling stock, and that is sufficient. I understand. You don't need to. But what is the theory then by which he would be in on it, know it's false, not sell any of his stock, announce they're going from phase 2 to phase 3 and eliminating the double blinds to the market, all knowing that it was going to blow up on him within a matter of weeks? That's sort of the bottom line point that I'm having trouble seeing how your theory fits around that. No, I understand that. And again, don't eat all six. If it ends up that he is not a part, a bunch of appellant will be willing to concede that. However, he could have multiple motives besides having his own pockets for booing the stock price. Remember, the stock doesn't fall to us. What's the motive you put forward under the PLSRA standard that we should find is sufficiently compelling? Well, we put forth a recklessness theory, and motive is not required for recklessness. But to answer your question, I would say booing the stock price. Remember, the stock drops after the class period, but it doesn't drop to where it was before they announced these blockbuster results. So certainly he still profited from making that announcement. So the timeline before you, just to make this crystal clear, is the company receives results in April 2012. Results get circulated, they sit on them for two weeks, and then they decide to announce them without checking those results. The same day, defendants go and sell unprecedented huge amounts to a scientific officer that very day. And the press release came out at 8 a.m., so later in the day. Can you go back a step, so they get the results, and then they have them for two weeks, they don't check them. Is there anything in the record that you say in the brief, and I can't remember if you say it in the complaint, that it's highly unusual to announce preliminary results? Does the complaint say that? The complaint does not say that. So as the complaint comes to us, what we have is results, and then they announce the results. And I guess I'm just having trouble figuring out, given that that's what the complaint says. For all we know, the results are the results that are after, that are as final as can be. Is there something in the complaint that tells me that those are unusual things to be announcing? Because that, to me, I can start to see how maybe it's reckless if these are not the kind of things one ordinarily puts out to the public. And you're saying, gee, these look really amazing, and they're sitting like this. And then you go ahead and put it out to the public. I can begin to see how maybe that's reckless. But what in the record tells me that there's anything strange about this, such that if we conclude that there's strong inputs of CN2 here, we're not opening up that every time you make a false statement about an important study, and then sell on it afterwards, which is a perfectly fine thing to do, that there's a claim. I understand that concern. If you look at the time period, they sit on the results for two weeks and don't discover this error. They announce it, sell massive amounts of stack, and then within those three weeks suddenly discover the error. So I think that in and of itself answers your question as to how these results could have been as final as possible. These defendants themselves were the ones that discovered the results and announced the results within three weeks. And I think the short class period there in three weeks is an extremely short class period for a 10B case. Proximity of announcement and correction is one element of CN2. And I think that in and of itself probably answers and allays your concern. Go back to the timeline. Maybe just another version of it. There's nothing in the... You call them preliminary results. There's no problem with announcing results like this. I imagine results like this get announced all the time, right? Presumably, yes. Presumably they're correct when they're announced. Right. And sometimes they're not. That I don't know. In this case, they weren't correct. And not only were they not correct, there were a number of red flags. So in thinking about recklessness, if it was like a... or something about what the ordinary practice is for results of this kind and what the due diligence is, I just don't know what baseline I'm using to evaluate that the conduct they engaged in in not doing or checking was reckless. All you seem to be pointing to is the fact that it was false. But that just seems like a gap because we usually measure recklessness not by was the outcome false but that in between you should have done something you didn't do. And I don't see in the complaint anything that tells me how to think about that question. Why should you be suspicious that this wasn't just the ordinary thing to do? So under NOVAC v. CASAS, which is the Second Circuit opinion but went into great detail about the standards surrounding CENTER, it clearly says that ignoring the suspicious or refusing to investigate the doubtful is classic recklessness. And here you've got the doubtful and the suspicious as evidenced by the induction effect, the presence of antibiotics, the sweat chloride levels, plus defendant's own misbelief about this is a once-in-a-lifetime thing. Those alone would give a duty for them to check the results. Do you have the actual... As I understand, there's an outside vendor that managed this study? That is a question for summary judgment because confidential witnesses say that the miscommunication wasn't with the vendor, it was all internal. But, yes, there was a vendor involved, the level of which, again, is for discovery. Somebody generated some study results that say precisely what they announced. Correct. Do you have that? We don't, again, discovering the state. This is a 10-B case that we were... So we don't know what that looks like, literally, so we know how... I mean, I can imagine one iteration of this data that when you look at it, you just do quick algebra in your head and see they got absolute and relative mixed up. I can imagine another presentation of it where it's only when you get to appendix B1 on an Excel spreadsheet that you'd see it. Do we know which we're dealing with here? No, we don't, but that would further my argument that this is for summary judgment and that in a motion to dismiss stage, the allegations have to be taken as true, which were that there was an error, defendants would have known about the error and turned a blind eye. Thank you. Thank you. Mr. Silva, good morning. Good morning, Your Honors. Jack Silva for the defendants. I have my colleague, Matt Levitt, with me. I thought it might be helpful just to preface this with what these results were, absolute versus relative. The suggestion here is the results were great, then they were awful. That's not what happened. When you have the difference between absolute and relative, for example, if you have somebody who has a 70% forced expiratory volume lung function, well, a relative improvement of 10% is 77% function. An absolute improvement would be 80%. So if you look at the numbers, you still have, when it's corrected, very significantly good numbers that are great. Why is that relevant to see it there? Well, because the commentary was that the results were unexpected, that they should have known better. What they saw was what Mueller was saying was a 10% improvement in absolute. We've never seen that. Well, you still have 10% improvement when it's corrected. So what's the relevance of it to see it there? So for example, going back just for recklessness, so they're going on. So recklessness here is the omission needs to be highly unreasonable, something more than inexcusable negligence, and it must be an extreme departure from the standards of ordinary care and present a danger of misleading investors that are so obvious that the defendants must have been aware of it. And when you look at this complaint, even viewed holistically, the allegations don't come close to that. At best, what they've alleged is a negligence case. And I think if you look at where they say there are obvious red flags, I mean, the results were just too good to be true. That was to my point that I was making is they were great, but they still were. Well, I think what you're trying to say, aren't you, is that relative or absolute, the results were too good to be true. They were great, but there was nothing that was particularly surprising about the differential between the absolute and the relative. Yes, so I'm going to say that the results were wrong. It's just that the characterization of relative or absolute, which you can't... I thought that the theory of the complaint is that when you get results that are too good to be true and there are some red flags that we're going to debate, when there are some red flags, you should check it. Because odds are you'll find out it was a mistake. It doesn't matter, I think, on their theory what the mistake is. It could have been smaller than it turned out to be. But they would still say it was false. And if you don't challenge materiality or something like that, then you go back to the Sienta argument. So all they're trying to say is the reckless conduct was failing to check results that were too good to be true. When there were some red flags, it should have been nothing to do with it. It doesn't matter what the error was, whether it was relative or absolute. It's just a matter of, was there reason for them to think that the results they were getting should have been checked before they put them out? Because had they been checked, odds are they would have corrected the mistake. So let me start with that, with the red flag, and then the check in to your point. The only allegation in the complaint is they say employees at the company were, quote, unquote, highly skeptical of the results. They cite to a confidential informant as the only source for that. But the confidential informant, they allege in paragraph 21 of the complaint, left the company before 2012. So the person is not even there, and there's no allegation in the complaint how that person would have found out what any employees at the company were thinking about the results in 2012. So that statement there, I would submit, is meaningless because they have not placed their employee at the company. He is not there at the time. Well, the announcement itself made clear this was like a knock-your-socks-off. It was pretty clear they weren't expecting this. And then just the second point, that you didn't test. That's an ipsedixit from counsel. There's no allegation in here that they didn't test the data or the results. And, in fact, there's no allegation as to how the mistake was discovered, what type of mistake it was. It's just it's being alleged that it's a simple math error. There's nothing in the complaint, as the district court recognized, that anyone could conclude that the cause of the mistake was a result of a math error. I think, at least as I understand the theory of the case, their proposition, if I understand it, is when you have results that are too good to be true in this preliminary, or at this stage, and there are some red flags, and, I guess we can add, and someone in the company is saying that there were people in there who recognized there might be a problem. Before you put it out to the public, it's reckless not to have done further checking. And they are alleging in the complaint, are they not, that they just sat on it for two weeks? I don't think that's exactly the way it's alleged in the complaint. The notion that they're going to come and say, with particularity, that the company didn't check. I mean, there's nothing in the complaint that talks about what the process was for analyzing the data, what the process was for taking that data and turning it into results. The only thing we have in the complaint, and the district court focused on, is that the person at the company who was the gatekeeper, a pulmonologist by trade, he is the one who was the interface between their vendor, a contract research organization, that getting the data, and what they say is that this trained professional, he should have known. Now, they don't say why he should have known, and the district court credited that. The district court said, well, if that's your case, and he should have known, that's a classic negligence case. That doesn't rise even to the level of inexcusable negligence. I would say that the district court was a little too generous to the plaintiff there, because there's nothing, again, about an Ipsodixib from counsel that he should have known. There's no reason to say, why should he have known? What was the data he was getting? You raised a question earlier, like, what was this data about? We don't know, because the record isn't there. All we know from this is that there were 37 patients, and they were undergoing a 56-day study. That's 2,000 data points right there. But we don't know, because you have it, and they don't. I'm just saying from what's alleged in the complaint. The thing that concerns me is the sales by Wazensky. They're huge sales, and then there is an allegation, as I understand it, that normally when a senior officer retires, which makes sense. Most companies do that. You don't announce suddenly that a senior officer is retiring today. So you've got this very large sales and then this kind of very unusual out-of-the-ordinary retirement. So that suggests she was fired. It may suggest she was fired or suggest that she left, but that would be if it's suggesting that she fired, then there should be an allegation saying that the company's press release that she retired was false. Well, that's another case. They haven't said that. So there's nothing in here that... Well, that's not fair. That would be a different class. It would be a different case. So stick with your case. You've got this senior person who makes these, what, $21 million profit, and then all of a sudden, right after it breaks that the error had been made, she announces her instant retirement. So you start with the fact that this is a recklessness case. There's no allegation that Ms. Wysenski or any of the other defendants knew about the error. Ms. Wysenski is alleged to have been a chief commercial officer. There's no allegation that even if she had the data that she would have been able to interpret it. So what you're really doing is bootstrapping a case of recklessness when you haven't alleged sufficient facts to make out recklessness because you have a sale. And, of course, this court has recognized that in and of itself, insider trading cannot support a finding of scienter. And certainly here, the suggestion would have to be that Ms. Wysenski was selling because she knew something. And there's no allegation in this case. Stay with that for a second. I don't see why recklessness wouldn't do. If she's sitting there and she knows, well, it's obvious this is wrong. And if I go look, I'll find out it's wrong. I'm not going to go look. Instead, I'm going to sell as much as I can sell before somebody else looks. And she does that. That's the theory. And then we get back to the situation where is it obvious that it is wrong to somebody who is the chief commercial officer. And this is where I think it comes in. It's an interesting point. You have the CEO who is the person who is in the lead with making these disclosures. He doesn't sell any stock. You have other individuals who are identified as making statements. You have the CFO, Mr. Smith, Partridge, a VP, Dr. Wright. Those three aren't even named as defendants. Presumably, they didn't sell. And you have Mueller and Wysenski who are people who sold. And then you identify three other individuals, Boger, Sylvia, and Julian, who are defendants, who are named defendants who aren't alleged to have made any statements. So what you've done is you've basically taken a situation where you have people making statements that are alleged to be misleading and not selling. You have individuals who are not alleged to have had any role in the making of any statements, are defendants, presumably just because they sold. And then you obviously have individuals who didn't sell any stock to try and create the issue that somehow this was a mad rush to the exits when you have many of the defendants and non-defendants not selling at all. And you're left with one individual who is a chief commercial officer, and the only allegation there is that she retired, and there is nothing but speculation in the brief that that was anything other than a retirement. And I would argue that even assuming that the court would conclude that her sales were somewhat unusual, the analysis that the court below did, both with respect to the fact that Mr. Boger's sales were not unusual, that there was not enough evidence in the record to make a determination whether the sales of the other defendants were unusual, either in the context of what their total holdings were, or over a period of time that would be an adequate sample size to know whether unusual. You're left with one person, and I would suggest that the Biogen Idec case suggests that even that one person, even if you were going to assume that insider trading can supplement an otherwise deficient recklessness case, that is not enough to get these plaintiffs over the hurdle. Going back to the checking point, this is from the district court. I don't have the complaint right with me, but it says, Through three confidential witnesses, the complaint alleges that Vertex had accessed the result for two weeks prior to the press release. That unnamed individuals at Vertex, quote, were highly skeptical of the applicable study because there was a noted lack of sweat chloride improvements. And that, quote, it was actually known for some time within Vertex that VX809 decreased the effectiveness of Kalydeca. According to the complaint, the, quote, results would have been sent to Wazensky, among others, through the normal course of business. In addition, quote, the committee of Vertex executives met to review the results determined by the information as material and warranted release. The complaint then alleges, quote, therefore defendants had access to the study results prior to their release and should have known or at least verified, it's got to be an allegation they didn't verify, that the suspects' results were unrealistic and unreliable. It also alleges, quote, the data announced on May 7, 2012 was just too beautiful and defendants would have known the results were out of the ordinary and needed to be checked. And then finally, it alleges defendants could easily have confirmed the percentage improvement calculations reported by Vertex vendors simply by reviewing the results actually reported patient by patient. All that could be wrong. And if you went into discovery and had somebody do it, you could prove it all. But I think there's no way to do this other than alleging that given how it could have been discovered, it actually was not checked and verified. What's wrong with that? Well, Your Honor, a couple of things. One of which is that they're drawing a distinction between results and data. Obviously there are data points. There is a vendor. What the complaint says is that the gatekeeper of the data is this pulmonologist. The fact that people had results, they announced the results. The results were in the press release. That doesn't say anything from looking at the results that you can tell anything. It's the issue of what was the data. The results are that they characterized summaries of the data as presented as absolute when it was relative. So that would be my first point is that nothing connects that any of these individuals had access to the data, which goes to the point that I made earlier is we don't know what the nature of the error was. There's nothing that suggests other than if you had access to the data, you would have known. The question is why? There's nothing in the complaint that gives any guidance with any particularity as to why you would have known that, what caused the error, how it was found, how it was fixed. None of the stuff that would allow one to make the conclusion, gee, if you had just looked at it again, you would have figured it out. And then I would just go back to the three points that you raised, and this goes back to one of the points. You keep coming back to this point. For a recklessness standard, why is it necessary that it's clear that you would have discovered it if you had done the checking? I would have thought just the question is whether it was reckless not to check. And what they would have to say is a highly unreasonable omission that goes higher than inexcusable negligence for to have not checked this. To put out to the public results that are this surprisingly good without doing any checking and just taking it from the vendor, that's the allegation. Why is that reckless? Well, I would parse the complaint more finely is that to just make the assertion that there isn't anything that identifies that employees said that they didn't check the results. So it's something that's an unsupported allegation, and you do need to plead with particularity, particularly when you have something that's just not conceivable that work was not done on this data. It was a clinical trial, and to suggest that, oh, you didn't check, and then you would have discovered it, I think it has to be two parts. One of which is that it needs to recklessness for not checking, and that the second is that the type of checking that they're alleging, simple math, would have discovered the discrepancy. And you can't reach that conclusion from this complaint because the complaint doesn't tell us anything about how the error occurred, how it was identified, or by whom. And just, I know my time is about up. No, it's not about up, it's up. Oh, it's up. Sorry about that. If there are any other questions, I will answer them. Otherwise, just rest on my brief. Thank you. Thank you, Your Honor. I believe you have three minutes, or two, I don't know. I reserve five, but I'll be as brief as possible and not use it. First of all, I just want to read a line from the Novak case, which says that, under certain circumstances, we have found allegations of recklessness to be sufficient, where plaintiffs allege facts demonstrating that defendants failed to review or to check information. That's exactly what we've alleged here. Second, counsel's point that the results were still good when they were reannounced on May 29th is belied by the fact that the stock price fell the highest amount that it had ever fallen. It had fallen in three years. So, obviously, the market didn't perceive the results to still be so good. And I would point out that in the time that the results, that the stock price was high, defendants made over $30 million. My third point, I think you touched upon a lot, is that counsel is just demanding too much at this point in time. Discovery has stayed. We have had not an ounce of discovery. They're asking us to explain the process by which the data was accumulated, how the data looked, what the pulmonologist's background was, what he knew or didn't know, what his training was. And, in fact, counsel said that the record isn't there. He's correct. There's no record. We don't have any discovery yet. So to require plaintiffs to plead that much information is to proverbially tie our hands behind our back, because we don't have any information. They do. We found as much information as we could at this point in time, and I believe that's adequate information as set forth in the complaint. As to Wysensky, she did have the data. As you read in the complaint, we said that she was given the data or the results in the ordinary course of business. And while we talked about her stock sales and her retirement, I think one point wasn't brought up, and that's that a week after the data is corrected, a U.S. senator publicly criticizes defendants for their stock sales. The complaint doesn't say publicly, I think. I think it says that the letter was made public on June 7th. I do think that his complaints were prior and that it was announced on June 7th that he published a letter to the SEC chairwoman. So is there any allegation that Wysensky knew of the letter or Vertex knew of the letter before the announced retirement? No, there isn't. So it's kind of irrelevant then, isn't it? Well, the fact that on June 7th, the world finds out about these stock sales. Vertex could have thought that the letter wasn't going to go public, so they'll clean it up on their own. The world finds out about these stock sales. The very next day, they announce the retirement of a 54-year-old woman, which to me is quite young for a retirement. But that's not the sequence to mention the complaint. Correct me if I'm wrong, but I believe the complaint says that Senator Grassley wrote a letter to the SEC on day one. And on day two, she announced her retirement. But it doesn't say that Vertex had or knew of the letter, does it? No, I believe that it says that the letter was made public on June 7th. You're right.  And then on June 8th, her retirement was announced effective immediately. Council has explanations for this, but I'd like to point out that Council has conceded that her stock options weren't going to expire upon retirement. So there was no need to sell over $21 million in stock before she retired. And I would look at the Cabletron case from this circuit. And also a very recent two-month-old decision from the Southern District of New York called In Re Salix, which was a pharmaceutical 10B case that did find C-enter, partly based on the fact that the error announced was easily discovered soon after, and partly based on a suspicious retirement. Unless the court has any questions, I'll rest on our brief in the argument today. Thank you.